MARTIN RUSSELL DIAMOND,            )
                                   )
            Plaintiff,             )
                                   )
      v.                           )          1:24cv553
                                   )
SERGEANT MR. WALKER, et al.,       )
                                   )
            Defendants.            )

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion for Summary Judgment" (Docket Entry 22 (the "Motion") at 1 )[1] filed by Wilbert Walker, Steven Gibson, Burnard Thompson, III, Ian Oxendine ("I. Oxendine"), Justin Oxendine ("J. Oxendine"), Ronald Covington, and Anthony Leonard (collectively, the "Defendants"). For the reasons that follow, the Court should deny the Motion.

**BACKGROUND**

In June 2024, Martin Russell Diamond (the "Plaintiff") filed a verified complaint (see Docket Entries 2 to 2-2) (collectively, the "Complaint") against Defendants for allegedly employing excessive force against him on February 6, 2022, during his incarceration at Scotland Correctional Institution. (See, e.g.,

---

[1] For legibility reasons, this Opinion omits all-cap and bold font, as well as the word "the" in front of "Plaintiff," in all quotations from the parties' materials. [Docket Entry page citations utilize the CM/ECF footer's pagination.]

Docket Entry 2 at 2-7; Docket Entry 2-1 at 20.)  The Complaint contains extensive, detailed, verified allegations regarding Plaintiff's efforts to exhaust his administrative remedies regarding the incident.  (See Docket Entry 2-1 at 23-28; Docket Entry 2-2 at 1-31; see also Docket Entry 2-2 at 32-53 (supporting exhibits).)  Defendants responded by generally denying the allegations against them, including "specifically den[ying]" (Docket Entry 21 (the "Answer") at 3) "Section VII, Administrative Procedures" (id.), "to the extent that it asserts or implies that Plaintiff has exhausted administrative remedies as required by law in connection with the claims asserted in this action against . . . Defendants" (id.).  Nevertheless, the Answer does not include failure to exhaust administrative remedies as one of its twelve affirmative defenses to Plaintiff's claims.  (See id. at 4-7.)

     The day after filing the Answer (compare id. at 7, with Docket Entry 22 at 2), however, Defendants "mov[ed] for summary judgment as to all claims on the grounds of the affirmative defense of Plaintiff's failure to exhaust administrative remedies" (Docket Entry 22 at 1).  Plaintiff filed a response in opposition to the Motion (see Docket Entry 29) (the "Opposition"), asserting, inter alia, that at a minimum a material factual dispute existed as to his exhaustion of administrative remedies (see, e.g., id. at 9).  Defendants failed to reply to the Opposition.  (See Docket Entries dated Aug. 25, 2025, to present (lacking any filings from

2

Defendants).) Thus, as relevant to the Motion, the record reflects:

## A. Plaintiff's Evidence

According to the Complaint:

On February 6, 2022, after Walker "slam[med]" him into a table (Docket Entry 2 at 16), Plaintiff spit on Walker as Walker, Thompson, Leonard, I. Oxendine, J. Oxendine, and Gibson escorted Plaintiff to the Receiving area for a strip search in preparation for Plaintiff's transfer into restrictive housing (see id.). After taking Plaintiff to a remote strip search room in the Receiving area, Walker beat Plaintiff at least thirty times with a baton, injuring Plaintiff, while Thompson, Leonard, I. Oxendine, J. Oxendine, Gibson, and Covington stood watch, verbally encouraging Walker to continue striking Plaintiff. (See id. at 17-19.) Walker only ceased beating Plaintiff after Plaintiff feigned unconsciousness. (See id. at 19-20.) Then, as Plaintiff exited the room after the beating, Walker suddenly punched Plaintiff in the left eye, causing Plaintiff further injury. (See id. at 20.)

At Plaintiff's insistence, he "was escorted to Medical" (id. at 24), where a nurse asked Plaintiff, "'How are you'" (id.) and Plaintiff responded, "'My head hurts but I'm going to be just fine when I file this lawsuit'" (id.), prompting an order from Covington for "Plaintiff to shut up" (id.). Plaintiff requested that officials photograph his injuries before the nurse examined him,

3

but Covington refused to allow anyone to photograph him. (See id. at 24-25.) After examining Plaintiff, the nurse said that he needed to go to the hospital. (See id. at 25.) As Plaintiff walked towards the transportation vehicle, he again asked about photographing his injuries, but officials refused to do so, prompting Plaintiff to say, "'That's cool[,] I'll make sure I put you in the lawsuit too'" (id.), which comment spurred one of the nearby officers to take two pictures of Plaintiff (although Covington thwarted attempts to take pictures of Plaintiff's head injury by covering Plaintiff's head with a shirt or towel) (see id.). Thompson and Leonard transported Plaintiff to the hospital, where medical personnel diagnosed Plaintiff with a "closed fracture of [the] left orbital floor (eye socket), finger fracture, chest wall contusion, back contusions, two lacerations of [the] scalp, hand contusion, and [a] closed head injury." (Id. at 26.) "Plaintiff underwent two laceration repair procedures," involving a total of sixteen staples, and received a splint for his finger fracture. (Id.) "Surgery was scheduled. Follow-ups for the [eye socket fracture were] scheduled" and medical personnel prescribed hydrocodone for Plaintiff's pain. (Id.)

During his transportation back to Scotland Correctional Institution, Plaintiff told Leonard, "'I'm not mad at Walker[.] If someone spit on me I would have fucked them up to[o].'" (Id.) "Leonard responded[,] 'Yeah it was the principle, nothing

4

personal,'" to which Plaintiff replied, "'I understand[,] but understand this[:] when I file my lawsuit it's nothing personal[,] just business.'" (Id.)

While awaiting his housing assignment after returning from the hospital on February 6, 2022, Plaintiff obtained a grievance form, which he promptly completed and submitted to the sergeant on duty. (See Docket Entry 2-2 at 2.)[2] "The grievance submitted was in full compliance with the North Carolina Department of Adult Correction's Division of Prisons Policy and Procedure Chapter G .0300 Administrative Remedy Procedure" (at times, the "ARP"). (Id.)[3]

_____

2  Against policy, however, "Plaintiff was never given an opportunity to write a use of force statement." (Docket Entry 2 at 26.)

3  The Complaint generally refers to the North Carolina Department of Adult Correction (at times, the "NCDAC") and attaches a copy of an NCDAC ARP (see id. at 32-42) that bears an issue date of August 2013 and a review date of December 2021 (see id. at 32, 42). According to Defendants' supporting memorandum, "[t]he North Carolina Department of Adult Correction ('DAC') is an Agency created on January 1, 2023[,] and was formerly the North Carolina Department of Public Safety ([at times, the] 'DPS') Division of Prisons. DAC and DPS may be used interchangeably." (Docket Entry 23 at 2 n.1.) In 2021, the North Carolina General Assembly created NCDAC "as a single, unified cabinet-level department," consolidating within it various duties and entities from the Department of Public Safety, including the "Prisons Section." N.C. Session Law 2021-180, available at https://www.ncleg.gov/EnactedLegislation/SessionLaws/HTML/2021-2022/SL2021-180.html (last visited Jan. 30, 2026). "The Grievance Resolution Board [also] transferred to the Department of Adult Correction" under that law. Id. Although various provisions — including that, "[t]hroughout the General Statutes, the Revisor of Statutes may replace . . . a reference to the Section of Prisons of the Division of Adult Correction and Juvenile Justice of the Department of Public Safety with a reference to the Division of Prisons of the Department of (continued...)

5

"Plaintiff observed the sergeant place the grievance inside the Grievance Box," but "[t]he grievance was not screened for acceptance or rejection by the screening officer[,] in direct violation of the [NCDAC ARP]." (Id.) "That violation of the grievance procedure directly caused Plaintiff's grievance to lose access to the Administrative Remedy Procedure, making the Administrative Remedy Procedure 'unavailable.'" (Id.)

Thereafter, "Plaintiff filed another grievance." (Id.) Specifically, on February 13, 2022, Plaintiff completed and submitted a grievance regarding "the excessive force incident of February 6, 2022." (Id.; see also id. at 11, 43 (reflecting filing date of February 13, 2022, rather than February 9, 2022).) Staff violated the ARP by not timely screening the grievance (see id. at 2-3), but "[t]he grievance was eventually screened and accepted as being in full compliance with the [ARP]" (id. at 3). "Due to a violation of the time frame established for Step 1 responses" (id.), officials forwarded the grievance to Step 2 (see id.). Plaintiff disagreed with the Step 2 response, which he "appealed to Step 3." (Id.; see also id. at 14 (alleging that, on March 21, 2022, Plaintiff received Step 2 response and "placed a check mark at (B) Appeal to Secretary, DPS[], signed, dated, and returned the

_____

3(...continued)
Adult Correction" — became immediately effective, the remainder of the provisions, including the aforementioned creation of NCDAC, became "effective January 1, 2023." Id.

Step 2 Response to the staff member who brought the response to Plaintiff's cell door and was waiting to rec[ei]ve the response back").)

After thirty days, incorrectly believing that the turn-around time for the Step 3 response had expired, Plaintiff "inquir[ed] into the Step 3 response." (Id. at 3.) "The Screening Officer sent Plaintiff a copy of a Step 2 DC-410 Response." (Id.)[4] "That response was a forgery of Plaintiff's Step 2 decision[;] instead of appeal to Step 3 [being] check marked[,] agree to Step 2 was check marked." (Id.; see also id. at 14 ("[After inquiring about the Step 3 response on April 20, 2022,] at mail call on April 22[,] 2022[,] Plaintiff received a copy of Plaintiff's purported Step 2 level response. It was fraudulent. On the rec[ei]ved copy of 'Plaintiff's' Step 2 level response agreed was check marked with Plaintiff's signature forged. Plaintiff on March 21[,] 2022[,] rec[ei]ved the Step 2 level response, Plaintiff did not agree with the response that no excessive force was used by staff (went contrary to Plaintiff's whole grievance statement), Plaintiff check marked (B) Appeal to Secretary.").) Staff's "actions directly le[d] to Plaintiff's grievance not being appealed from Step 2 to the final level Step 3. Staff's forgery and submission of a forged document thwarted Plaintiff's utilization of the Administrative

---

4   Per the ARP, an inmate in state custody "may submit a written grievance on Form DC-410." (Id. at 34; Docket Entry 23-1 at 3.)

Remedy Procedure to obtain relief for the action complained of."
(Id. at 3.) In sum, "[s]taff actions made the Administrative
Remedy Procedure 'unavailable.'" (Id.) "Plaintiff filed another
grievance and wrote [to] the Warden about staff's misconduct
concerning the forgery and submission of the forgery (interference
of grievance process)." (Id.)

"[O]n April 22, 2022[,] after receiving the fake [response,
Plaintiff] submitted another grievance about the excessive use of
force by staff on February 6, 2022." (Id.) "Staff confirmed to
Plaintiff that the grievance was placed in the Grievance Box. The
grievance submitted was in full compliance with the [NCDAC ARP, but
t]he grievance was not screened for acceptance or rejection by the
Screening Officer[,] in direct violation of the [NCDAC ARP]." (Id.
at 4.) "That violation of the [ARP] directly caused Plaintiff's
grievance to be blocked [from] access to the [ARP,] making the
[ARP] 'unavailable.'" (Id.) "Plaintiff filed another grievance."
(Id.)

"On April 27[,] 2022[,] Plaintiff submitted two grievances"
regarding the excessive force incident to staff, one for the
Grievance Box, the other for transmission to the Screening Officer
through the internal mail system. (Id.) The grievances fully
complied with the ARP, and "Officer Locklear confirmed that both
items were placed in the appropriate places." (Id.) Yet, in
direct violation of the ARP, "[n]either grievance was screened for

8

acceptance or rejection by the Screening Officer" (<u>id.</u>), rendering unavailable the ARP (<u>see</u> <u>id.</u> at 4-5). "Plaintiff filed another grievance." (<u>Id.</u> at 5.)

"On May 2[,] 2022[,] Plaintiff submitted six grievances," each of which fully complied with the ARP. (<u>Id.</u>) "One was for the Grievance Box, four were for direct submission to various prison officials [through] the prison's internal mail system, [and] one was a confidential grievance to be mailed to the Deputy Secretary of Prisons." (<u>Id.</u>) "Staff confirmed to Plaintiff that each item submitted was placed in the appropriate place." (<u>Id.</u>) However, directly violating the ARP, "[n]one of the five grievances submitted internally on May 2[,] 2022[,] was screened for acceptance or rejection by the Screening Officer," rendering unavailable the ARP. (<u>Id.</u>) Conversely, "[t]he confidential grievance that Plaintiff mailed to the Deputy Secretary on May 2[,] 2022[,] was screened and accepted." (<u>Id.</u>; <u>see also</u> <u>id.</u> at 21 (explaining that, "[i]f a confidential grievance is returned to an inmate from the Deputy Secretary of Prisons it has been rejected[, but] Plaintiff's confidential grievance was not returned meaning acceptance").) Because the ARP prohibits Plaintiff from receiving anything other than a Step 1, Step 2, and Step 3 response, Plaintiff "had to rely on th[e] lack of remedies sought occurring

9

to make a determination of the grievance response." (Id. at 5-6.)[5] As all grievances must be completed within ninety days, after ninety days passed without the occurrence of Plaintiff's requested remedies, "Plaintiff appealed the apparent grievance denial response" (id. at 6). (See id. at 5-6.) Because the ARP "provides no information about confidential grievance appeals" (id. at 6), Plaintiff used his best judgment and, on August 3, 2022, "submitted three confidential grievance appeals" (id.) "to the Deputy Secretary of Prisons, Secretary of Adult Correction, and State of North Carolina Offender Grievance Resolution Board" (id.). After another ninety days elapsed without the requested remedies, Plaintiff concluded that his "confidential grievance appeal was denied." (Id.; see also id. at 23 (noting that under ARP, if "inmate does not rec[ei]ve a response within the time provided for [a] reply . . ., the absence of a response shall be a denial").)

Separately, "[o]n May 9[,] 2022[,] in response to the internal grievances submitted [on] May 2[,] 2022[,] being ignored/not screened, Plaintiff wrote another grievance." (Id. at 7.) However, rather than using the internal mail system or Grievance Box, "Plaintiff asked Officer Locklear to place the grievance under the Unit Manager's office door," and Officer Locklear subsequently

_____

    5    Plaintiff's grievances requested, inter alia, an investigation into the incident and the opportunity for Plaintiff to write an incident report statement. (See, e.g., id. at 10, 12, 16, 18, 21, 26-28, 30.)

10

"confirmed that the grievance was placed inside the Unit Manager's office under the door." (Id.) "On May 12[,] 2022[,] the Unit Manager personally told Plaintiff that the grievance was signed by the Unit Manager and given to the Screening Officer." (Id.) Although the ARP requires the Screening Officer "to screen a grievance for acceptance or rejection" (id. at 8) within three days (see id. at 7-8), "eleven days after the Unit Manager Mr. Scott submitted Plaintiff's grievance to Ms. Locklear (the Screening Officer) the grievance still was not screened" (id. at 8). "On May 23[,] 2022[,] Plaintiff submitted a request for information form to Ms. Locklear. The request form explained that Plaintiff knew Mr. Scott signed off on the grievance [on] May 12[,] 2022[,] but Plaintiff['s] grievance still was not screened by her yet." (Id.) The following day, "Ms. Locklear screened the submitted grievance and rejected it as being over ninety days between the date of the alleged incident and the submission of the grievance." (Id.)

"Plaintiff filed a grievance seeking the allowance of the rejected grievance to be processed." (Id.) Although that "grievance was accepted as being in full compliance with the [ARP,] Plaintiff never rec[ei]ved a Step 1, Step 2, or Step 3 response." (Id.) Instead, "[t]he grievance was simply ignored in violation of [the NCDAC ARP]." (Id.)

Plaintiff included with the Complaint a detailed explanation of each grievance, including its contents, when and to whom he

11

submitted it, and the treatment of that grievance. (See id. at 10-31.) He also submitted "a true and accurate copy of the [NCDAC ARP,] the February [13,] 2022[,] Grievance with the Step 1 response, the Step 2 response forgery[,] and the Warden's letter to [Plaintiff] about the grievance tampering (and no access to law library)," as well as "the May 9[,] 2022[,] grievance with the request for information form sent to [the] Screening Officer and the DC-410 Screening response that followed." (Id. at 9; see id. at 32-53.)

### B. Defendants' Evidence

For their part, Defendants submitted a copy of the DPS ARP issued on August 1, 2013 (see Docket Entry 23-1 at 1), as well as declarations from Kimberly Grande, the executive director of the NCDAC Inmate Grievance Resolution Board (the "IGRB") (see Docket Entry 23-2 (the "Grande Declaration") at 1), and Dean Locklear, Scotland Correctional Institution's Associate Warden (see Docket Entry 23-4 (the "Locklear Declaration") at 1). According to the Grande Declaration:

"The IGRB employs grievance examiners, who are charged with investigating inmate grievances in accordance with the procedures established by the [ARP]." (Docket Entry 23-2, ¶ 4.) The current version of the ARP became effective on September 30, 2023. (See id.) "The ARP establishes a three-tier review process for inmate grievances, and appeal to the IGRB is the final step (Step 3).

12

Exhaustion of administrative remedies by an inmate in the custody of NCDAC is not complete until the IGRB completes Step 3 Review and issues an order." (Id., ¶ 5.) Grande reviewed "IGRB records for all Step 3 Grievance Appeals submitted by [Plaintiff] between February 1, 2022, through March 20, 2025." (Id., ¶ 9.) During that period, Plaintiff exhausted 18 grievances through Step 3. (Id., ¶ 10.) The earliest such grievance bears a date of April 23, 2023. (See id.) Grande attached a copy of those grievances to her declaration. (See id.; see also Docket Entry 23-3.)

In turn, Locklear avers:

In his role as Associate Warden, Locklear "oversee[s] the day-to-day operations at [Scotland Correctional Institution]." (Docket Entry 23-4, ¶ 2.) "Grievances are tracked and maintained in the Correspondence Tracking System. CTS tracks all grievances, even those terminating at Step 1 and 2. A table of [Plaintiff's] CTS record of grievances is attached as Exhibit A." (Id., ¶ 3.) "In accordance with Statewide policy, Scotland [Correctional Institution] provides all offenders a grievance process. Offenders are provided the DC-410 form on which they can file their grievance on any issue they desire. The facility takes the grievance process seriously." (Id., ¶ 4.) "Offenders can either place their grievance in a secured lock-box or hand it directly to a sergeant or higher ranking officer on duty. Officers know that offender grievances are part of the job and they do not get offended when

13

offenders file grievances for their actions." (Id., ¶ 5.) "The Grievance process at Scotland [Correctional Institution] is maintained in accordance with statewide policy and is available to all offenders, including [Plaintiff]." (Id.)

The attached "CTS/Grievances" document contains a five-column table. (See Docket Entry 23-5 at 1-2.) The first column contains a descriptive label, such as "Staff conduct" (id. at 2 (underscoring omitted)); the second column contains the Grievance number (see, e.g., id. ("Grievance — 17544")); the third column contains a date (see, e.g., id. ("02/22/2022")); the fourth column contains the status ("Completed" or "In Process") (id. at 1-2); and the final column contains a facility name and number (such as "4860:Scotland CI" (id. at 2)). The earliest entry on this table bears the label "Requesting Status of Special Draw submi," a Grievance number of 15708, a date of June 29, 2021, a "Completed" status, and a location of "3600:Southern CI." (Id. (alterations and underscoring omitted).) However, all entries on that row bear a line through them (e.g., "~~06/29/2021~~"), in an apparent attempt to strike them from the table. (Id.) No explanation of that alteration appears on the exhibit or in the Locklear Declaration. (See Docket Entries 23-4, 23-5.)

## C. The Administrative Remedy Procedure

Aside from the review date and signature, the copies of the ARP that Plaintiff and Defendants submitted appear similar in all

14

material respects, except for the titles involved. (Compare Docket Entry 2-2 at 32-42 (generally referencing NCDAC and associated titles), with Docket Entry 23-1 (referencing DPS and associated titles).)[6]  Both copies of the ARP envision three types of grievances — "Emergency Grievances," "Confidential Grievances," and regular grievances (i.e., non-emergency, non-confidential grievances) — each of which follows its own procedures. (See Docket Entry 2-2 at 36-40; Docket Entry 23-1 at 6-9.) Nevertheless, per the ARP, "[f]rom filing to final disposition, all grievances shall be processed within ninety (90) days," with "[t]he 90-day period commenc[ing] the day after the grievance has been accepted." (Docket Entry 2-2 at 35; accord Docket Entry 23-1 at 4.)  "Within three days after submission of the grievance, the inmate who submits the grievance will be notified of acceptance or rejection in writing upon the appropriate form." (Docket Entry 2-2 at 35; Docket Entry 23-1 at 4.)  "If, at any step of the procedure, a response is not made within the prescribed time limits, the grievance will be forwarded to the next step for review." (Docket

―――――――――――

6  Although it bears an August 1, 2013, date in the upper left corner of its second through eleventh pages, the copy of the ARP that Plaintiff submitted contains a "Review Date" of "December 18, 2021" on the first page and a signature of the "Secretary of Adult Correction" dated "December 13, 2021" on the final page.  (See Docket Entry 2-2 at 32-42.)  Although it also bears the August 1, 2013, date on the upper left corner of its second through eleventh pages, Defendants' copy of the ARP lacks the "Review Date" (id. at 32) on the first page and contains a signature of the "Director of Prisons" dated August 1, 2013, on its final page.  (See Docket Entry 23-1 at 1-11.)

Entry 2-2 at 35; Docket Entry 23-1 at 4.) "At each procedural level or step an appeal shall be requested within twenty-four (24) hours of receipt of written denial or the right to appeal shall be waived," but "[t]he person to whom the appeal is directed has the discretion to accept a late appeal in the event of extenuating circumstances." (Docket Entry 2-2 at 35; Docket Entry 23-1 at 4.)

For grievances proceeding through the regular grievance review process, the following "time limits" apply. (Docket Entry 2-2 at 35; Docket Entry 23-1 at 5.) "At Step 1, formal written response to the inmate shall be made within fifteen (15) days from the date of acceptance of the grievance." (Docket Entry 2-2 at 36; Docket Entry 23-1 at 5.) "At Step 2, formal written response to the inmate shall be made within twenty (20) days from the date of request for Step 2 review." (Docket Entry 2-2 at 36; Docket Entry 23-1 at 5.) Next:

> At Step 3, the Inmate Grievance Examiner (IGE) shall forward the decision to the Secretary of Public Safety within twenty (20) days from the date of the inmate's appeal. Within twenty days from the date of transmittal of the DC-410 from the IGE, the Director of Prisons shall forward a written response to the Secretary of Public Safety.

(Docket Entry 2-2 at 36; Docket Entry 23-1 at 5.) "The final decision of the Secretary of Public Safety must be delivered to the inmate within thirty (30) days of the transmittal of the decision from the IGE." (Docket Entry 23-1 at 5; accord Docket Entry 2-2 at 36 (same, but for decision of "Secretary of Adult Correction").)

16

If at any level of the administrative remedy process, including the final level, the inmate does not receive a response within the time provided for reply, including any properly noticed extension, the absence of a response shall be a denial at that level which the inmate may appeal, but the 24 hours time limit to request an appeal does not begin until the inmate receives a written denial.

(Docket Entry 2-2 at 36; Docket Entry 23-1 at 5.)

For regular grievances, the ARP establishes a three-step review process, found in Section .0310. (See Docket Entry 2-2 at 38-40; Docket Entry 23-1 at 7-9.) An inmate may initiate the grievance process by completing a Form DC-410 and giving the completed form to a staff member for transmission, by hand delivery or mail, to the appropriate official. (See Docket Entry 2-2 at 38; Docket Entry 23-1 at 7.) "The screening officer shall review the grievance and decide whether it should be accepted, rejected, or returned under the criteria set forth in this policy. This screening shall be completed within three (3) days of the submitting the grievance." (Docket Entry 2-2 at 38; Docket Entry 23-1 at 7.) "If the screening officer rejects the grievance . . ., the inmate will be informed of the rejection reason in writing on the DC-410. A copy of all rejected grievances will be reviewed, initialed, and retained by the Facility Head." (Docket Entry 2-2 at 38; Docket Entry 23-1 at 8.) "The Facility Head may determine that the grievance should be accepted. If so, the inmate will be notified in writing and provided the opportunity to resubmit the

17

grievance on a new DC-410 [form] . . . ." (Docket Entry 2-2 at 38-39; Docket Entry 23-1 at 8.)

"If the inmate is not satisfied with the Step 1 decision, he or she may request relief from the Facility Head," by appealing the Step 1 response within twenty-four hours of receiving it. (Docket Entry 2-2 at 39; accord Docket Entry 23-1 at 8.) "The Facility Head may investigate the grievance or may assign a staff member to investigate it." (Docket Entry 2-2 at 39; Docket Entry 23-1 at 8.) After the investigation, "the Facility Head shall complete Form DC-410 indicating the decision and reasons for the decision." (Docket Entry 2-2 at 39; Docket Entry 23-1 at 8.)

"If the inmate is not satisfied with the Step 2 decision he or she may appeal to the Secretary of Public Safety through the [IGE]," within twenty-four hours of receiving the Step 2 response. (Docket Entry 2-2 at 39; Docket Entry 23-1 at 9.) "The IGE will order such relief as is appropriate or deny the grievance. The IGE shall forward any order for relief on Form DC-410 to the Secretary of Adult Correction within twenty (20) days from the date of the inmate's appeal from Step 2." (Docket Entry 2-2 at 40; see also Docket Entry 23-1 at 9 (same, but forwarding to "Secretary of Public Safety").) "Simultaneously, a copy of the form DC-410 reflecting the decision shall be forwarded to the Deputy Secretary of Prisons." (Docket Entry 2-2 at 40; see also Docket Entry 23-1 at 9 (same, but forwarding to "Director of Prisons").)

18

Lastly:

> The Deputy Secretary of Prisons or designee shall review the grievance and may make comments to the Secretary of Adult Correction. The Deputy Secretary of Prisons' comments will be forwarded to the Secretary of Adult Correction within twenty (20) days from the date of transmittal of Form DC-410 from the [IGE]. The Secretary of Adult Correction shall review the Deputy Secretary of Prisons' comments and then approve the decision of the IGE or make written findings that the relief ordered is not appropriate. If it is determined that the relief ordered is not appropriate, a written explanation for the findings must be given and an alternative order for relief must be made. The Secretary of Adult Correction's final decision will be delivered to the inmate by the IGE, with a copy to the Deputy Secretary of Prisons, within thirty (30) days of transmittal of the decision from the IGE.

(Docket Entry 2-2 at 40; <u>see also</u> Docket Entry 23-1 at 9 (same, referencing "Director of Prisons" and "Secretary of Public Safety," respectively).) "The decision by the IGE or a modification by the Secretary of Adult Correction shall constitute the final step of the Administrative Remedy Procedure." (Docket Entry 2-2 at 40; <u>see also</u> Docket Entry 23-1 at 9 (same, referencing "Secretary of Public Safety").)

As for "Confidential Grievances," the ARP provides:

> If an inmate believes that a grievance is [of] a confidential nature, his grievance may be submitted directly with the Deputy Secretary of Prisons and mailed as legal mail. The inmate must clearly explain the nature of the complaint and the reasons for not following the regular grievance procedure. If the Deputy Secretary determines that the grievance is not of a confidential nature, the grievance shall be returned to the inmate with instructions to submit it in accordance with the procedure set forth in Section .0310. If the Deputy Secretary determines that the grievance is in fact confidential in nature, the Deputy Secretary shall order

19

any necessary investigation. If the investigation indicates action should be taken, the Deputy Secretary shall cause the appropriate action to be taken to resolve the grievance.

(Docket Entry 2-2 at 37-38; <u>see also</u> Docket Entry 23-1 at 7 (same, referencing "Director of Prisons").)

## **DISCUSSION**

### **I. Relevant Standards**

#### **A. Summary Judgment**

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him." <u>Miller v. Leathers</u>, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc)

(internal quotation marks omitted) (brackets in original). If, applying this standard, the Court "find[s] that a reasonable [fact-finder] could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

### B. Administrative Exhaustion

As relevant here, the Prison Litigation Reform Act of 1995, as amended (the "PLRA"), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). The defendant bears the burden of establishing that a prisoner failed to exhaust administrative remedies. See Jones v. Bock, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."); see also, e.g., Whatley v. Judge, No. 5:23ct3277, 2025 WL 2921830, at *3 (E.D.N.C. Oct. 14, 2025) ("Failure to

21

exhaust administrative remedies is an affirmative defense that defendants generally must plead and prove.").

Nevertheless, the "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge." Drippe v. Tobelinski, 604 F.3d 778, 782 (3d Cir. 2010); see also Lee v. Willey, 789 F.3d 673, 677 (6th Cir. 2015) ("[A]ll . . . of the circuits that have considered the issue agree that judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." (internal quotation marks omitted)).[7] A prisoner satisfies the PLRA exhaustion requirement when he "ha[s] utilized all available remedies 'in accordance with the applicable procedural rules,' so that prison officials have been given an opportunity to address the claims administratively." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008) (quoting Woodford v. Ngo, 548 U.S. 81, 88 (2006)). Thus, the relevant prison's grievance procedures determine the steps that a prisoner must take to meet his exhaustion obligations. See id. at 726.

Importantly, though, "the exhaustion requirement hinges on the 'availability' of administrative remedies: An inmate, that is,

---

[7] However, "parties have a right to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of [the plaintiff's] claim." Perttu v. Richards, 605 U.S. 460, 468 (2025); see also id. at 464 (explaining that case involved intertwined First Amendment and exhaustion issues, "because both depend on whether [defendant prison employee] did in fact destroy [plaintiff inmate's] grievances and retaliate against him"). That situation does not apply here.

must exhaust available remedies, but need not exhaust unavailable ones." Ross v. Blake, 578 U.S. 632, 642 (2016) (brackets omitted); see also Griffin v. Bryant, 56 F.4th 328, 335 (4th Cir. 2022) (observing that exhaustion requirement contains "a built-in exception," namely "that a prisoner need not exhaust remedies if they are not 'available'" (certain internal quotation marks omitted)). As the United States Court of Appeals for the Fourth Circuit has explained:

> [T]he [PLRA] spells out a crucial "limitation on an inmate's duty to exhaust" administrative remedies — "[he] need not exhaust unavailable ones." Pursuant to Ross, if a prison grievance procedure's provided avenues for recourse are not meaningfully "capable of use to obtain some relief for the action complained of," the exhaustion requirement "does not come into play." And the Ross Court identified three circumstances where an administrative remedy, "although officially on the books, is not capable of use to obtain relief": (1) where the remedy "operates as a simple dead end," with prison officials "unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where an administrative scheme is "so opaque" that it is "practically . . . incapable of use" because "no ordinary prisoner can discern or navigate it"; and (3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

Griffin, 56 F.4th at 335 (citations omitted) (ellipsis and final set of brackets in original).

## II. Analysis

### A. Waiver Contention

As an initial matter, Plaintiff maintains that Defendants waived their exhaustion argument by failing to raise it in their

23

Answer. (See Docket Entry 29 at 7-8.) As Plaintiff correctly notes (see id. at 7), Defendants failed to include administrative exhaustion in their twelve affirmative defenses, notwithstanding the Complaint's extensive discussion of Plaintiff's exhaustion efforts (see Docket Entry 21 at 4-7). Per the Federal Rules of Civil Procedure (the "Rules"), "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense," Fed. R. Civ. P. 8(c)(1).[8] "It is settled that a failure to raise an affirmative defense in the appropriate pleading results in the loss of that defense." RCSH Operations, L.L.C. v. Third Crystal Park Assocs. L.P., 115 F. App'x 621, 629 (4th Cir. 2004). "However, even if a party fails to plead an affirmative defense, the opposing party still must show 'prejudice or unfair surprise' before the waiver will be enforced." Id. at 630. "This is because the Supreme Court has held that the purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it." Grunley Walsh U.S., LLC v. Raap, 386 F. App'x 455, 459 (4th Cir. 2010) (brackets and internal quotation marks omitted). Notably, "[c]ourts have found that affirmative defenses raised for the first time in summary judgment motions may provide the required notice." Id.

---

8 The Rules separately require the responding party to "admit or deny the allegations asserted against it by an opposing party." Fed. R. Civ. P. 8(b)(1)(B).

24

Here, the Complaint details Plaintiff's efforts to exhaust his administrative remedies, reflecting his awareness of the administrative exhaustion issue. (See, e.g., Docket Entry 2-2 at 1-31.) Moreover, although it does not comply with Rule 8(c), the Answer does "specifically den[y]" (Docket Entry 21 at 3) the allegations in "Section VII, Administrative Procedures" (id.), "to the extent that [such Section] asserts or implies that Plaintiff has exhausted administrative remedies as required by law in connection with [his claims against Defendants]" (id.). Further, Defendants filed the Motion the day after filing their Answer (compare id. at 7, with Docket Entry 22 at 2), providing Plaintiff prompt notice of Defendants' assertion of the administrative exhaustion defense. Finally, the Opposition does not assert that Defendants' failure to comply with Rule 8(c) prejudiced Plaintiff (see Docket Entry 29 at 7-8), but it does substantively address Defendants' administrative exhaustion arguments (see id. at 8-13). Under the circumstances, the Court should address the merits of Defendants' administrative exhaustion defense. See, e.g., Grunley Walsh, 386 F. App'x at 459 (explaining that "the parties fully briefed and argued the merits of the [relevant] affirmative defense," and "find[ing] that [the plaintiff] has shown no unfair surprise or prejudice from consideration of an issue [the plaintiff] itself fully argued").

25

**B. Administrative Exhaustion Challenge**

According to Defendants, the fact that Plaintiff exhausted other grievances "to Step Three conclusively demonstrate[s] . . . that Defendants process Plaintiff's grievances through completion" and thus that "Plaintiff was not prevented from utilizing the ARP through exhaustion regarding this matter." (Docket Entry 23 at 9.) Instead, Defendants maintain, "[Plaintiff] simply chose not to follow through with a grievance for the facts he alleges in his Complaint." (Id.) This contention misses the mark.

To begin, Defendants entirely ignore Plaintiff's sworn assertions regarding his confidential grievance. (See id. at 1-12.) Plaintiff avers that, in compliance with the ARP, he mailed a confidential grievance regarding the relevant incident to "the Deputy Secretary of Prisons," which grievance "was screened and accepted" (Docket Entry 2-2 at 5), as it "was not returned" to Plaintiff (id. at 21). Accepted as true, see Miller, 913 F.2d at 1087, this assertion exhausts administrative remedies under the ARP that Plaintiff attached to the Complaint (see Docket Entry 2-2 at 37-38). See, e.g., Sutherland v. Sapper, No. 5:20ct3322, 2023 WL 6276616, at *5 (E.D.N.C. Sept. 26, 2023) ("determin[ing that the] plaintiff has sufficiently alleged he has exhausted his administrative remedies as to his conditions of confinements claims" where he "alleges he mailed a confidential grievance to defendant Dail, as Director of Prisons, explaining the

26

unconstitutional conditions of confinement," but "did not receive a response, and thus, such nonresponse would be considered a denial under the ARP"), on reconsideration in part, No. 5:20ct3322, 2025 WL 963584 (E.D.N.C. Mar. 31, 2025).

Given its references to NCDAC, however, that ARP appears to post-date Plaintiff's grievance attempts. See N.C. Session Law 2021-180, available at https://www.ncleg.gov/EnactedLegislation/SessionLaws/HTML/2021-2022/SL2021-180.html (last visited Jan. 30, 2026); see also G.0300 Administrative Remedy Procedure, available at https://www.ncdps.gov/documents/g0300-administrative-remedy-procedure (last visited Jan. 30, 2026) (containing ARP, published "September 13, 2022," with "Review Date" of December 18, 2021, and signature by "Commissioner of Prisons" on "12/13/2021," that references DPS rather than NCDAC).[9] Notably, though, the NCDAC "Deputy Secretary of Prisons" appears to be the same individual as the DPS "Director of Prisons." (Compare, e.g., Docket Entry 2-2 at 36 (describing relevant official as "Director of Prisons"), with id. at 40 (describing relevant official as "Deputy Secretary of Prisons").) Under the ARP that Defendants submitted,[10] an inmate

_____

    9    The Court may take judicial notice of this ARP. See Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (observing that the Court "may properly take judicial notice of matters of public record").

    10    Per Defendants' summary judgment memorandum, "Policy G.0300 attached as Exhibit 1 was in effect during times relevant to Plaintiff's Complaint until October 1, 2023[,] when it was updated
                                                              (continued...)

can exhaust administrative remedies by sending to the Director of Prisons a confidential grievance that the Director of Prisons does not return to the inmate. (See Docket Entry 23-1 at 7.)[11] As such, a genuine issue of material fact exists regarding whether Plaintiff exhausted his administrative remedies via submission of a confidential grievance. See Sutherland, 2023 WL 6276616, at *5 & n.3 (denying motion to dismiss and for judgment on pleadings where plaintiff alleged submission of confidential grievance, but declining, at that time, "to address whether [relevant official] in fact received plaintiff's letter and grievance or [the plaintiff] used the proper procedure to send the documents").

Defendants likewise fail to address the Complaint's sworn assertions that staff forged a Step 2 response for Plaintiff's February 13, 2022, grievance, changing his request for an appeal into an agreement with the finding that officials did not use excessive force against him (see Docket Entry 2-2 at 3, 14). (See

_____

    10(...continued)
to the current version referenced in Exhibit 2 by its URL." (Docket Entry 23 at 2 n.2.) Notably, though, "[s]tatements in a brief are not evidence." Bayer CropScience Inc. v. Syngenta Crop Prot., LLC, No. 1:13cv316, 2013 WL 12137000, at *1 (M.D.N.C. Dec. 12, 2013); see also United States v. White, 366 F.3d 291, 300 (4th Cir. 2004) (explaining that "an attorney's unsworn argument does not constitute evidence"). In any event, the current record does not establish which version of the ARP applied to Plaintiff's attempts to exhaust administrative remedies on his excessive force claim.

    11  The same applies to the ARP published in September 2022. See https://www.ncdps.gov/documents/g0300-administrative-remedy-procedure/open, at 6-7 (last visited Jan. 30, 2026).

28

Docket Entry 23 at 1-12.)  The Opposition reiterates that
"Plaintiff was thwarted by prison officials from taking advantage
of a grievance process through machination when th[is forgery
occurred]" (Docket Entry 29 at 11), which prevented his grievance
"from being reviewed at the Step 3 level" (id.), creating "a
genuine dispute of material fact" regarding Plaintiff's compliance
with the administrative exhaustion requirement (id. at 13; see also
id. at 12-13 (highlighting various facts that undermine notion
Plaintiff would have agreed to Step 2 response, including his
comments regarding filing a lawsuit, extent of his injuries, and
his repeated attempts to grieve the incident)).  By failing to
respond to Plaintiff's arguments regarding the forged grievance
(see Docket Entries dated Aug. 25, 2025, to present; see also
Docket Entry 23 at 1-12), Defendants conceded them.  See Kinetic
Concepts, Inc. v. Convatec Inc., No. 1:08cv918, 2010 WL 1667285, at
*8 (M.D.N.C. Apr. 23, 2010) (discussing "general principle that a
party who fails to address an issue has conceded the issue")
(collecting cases).  In any event, "there is no evidence of record
disputing [that P]laintiff's signature was forged on [the relevant]
Step [2] response," creating "a genuine issue of material fact as
to whether the grievance process was available to [P]laintiff for
his [excessive force] claim[]."  Sutherland v. Sapper, No.
5:20ct3322, 2025 WL 963584, at *8 (E.D.N.C. Mar. 31, 2025)
("Sutherland II"); see also Ross, 578 U.S. at 644 (explaining that

29

administrative procedure qualifies as "unavailable" where "prison administrators thwart inmates from taking advantage of a grievance process through machination[ or] misrepresentation").

Next, although not directly acknowledging Plaintiff's averments that officials failed to screen his repeated grievances (see Docket Entry 23 at 1-12), Defendants contend that, "[g]iven that the facility has accepted and responded to grievances[,] Plaintiff cannot show an inability of the facility to fail [sic to accept his grievance" (id. at 11). However, the simple fact that Plaintiff successfully exhausted other grievances through Step 3 does not, by itself, defeat his contention that staff thwarted his attempts to successfully grieve his excessive force claim by failing to screen his grievances. See, e.g., Moss v. Harwood, 19 F.4th 614, 622 (4th Cir. 2021) (acknowledging that "cases recogniz[e] that an inmate able to file one grievance is not necessarily able to file others, at different times or on different topics," and agreeing that "[a] prisoner's ability to take advantage of administrative grievances is not an 'either-or' proposition . . ., because sometimes grievances are clearly available; sometimes they are not; and sometimes there is a middle ground where, for example, a prisoner may only be able to file grievances on certain topics" (brackets and certain internal quotation marks omitted)); see also Hill v. O'Brien, 387 F. App'x 396, 401 (4th Cir. 2010) ("find[ing the d]efendants' reliance on

[the plaintiff's] high-volume [grievance] filings specious," and observing, inter alia, that "the fact that [the plaintiff] successfully filed many grievances in the past suggests that [he] is familiar with the requirements of the administrative process and is not purposefully attempting to evade them").

Defendants further maintain that "it is apparent through the CTS data[ that] facilities administered the grievance process professionally and in accordance with statewide policy." (Docket Entry 23 at 12.) Yet, the record reflects that officials did not always adhere to the ARP requirements. (See, e.g., Docket Entry 2-2 at 46 (noting "[t]ime frame violation" for Step 1 response to Plaintiff's February 13, 2022, grievance); id. at 51-53 (reflecting that screening officer screened grievance twelve days after unit manager signed grievance — which itself occurred three days after date on grievance — and only after Plaintiff submitted request for information form detailing his awareness of date unit manager signed grievance).) Moreover, Plaintiff disputes the accuracy of the CTS data, noting, inter alia, that it omits "the grievance(s) used to satisfy the PLRA's requirement in Diamond v. Oderere[, No.] 1:22cv287 [(M.D.N.C.)]" (Docket Entry 29 at 10 (underscoring added)), an excessive force case regarding an incident on April 12, 2021, see Diamond, No. 1:22cv287, Docket Entry 1 at 1-7 (M.D.N.C. Apr. 12, 2022), that Plaintiff successfully pursued to settlement against two DPS officers,, see id., Docket Entry 115 at 1 (M.D.N.C.

31

Jan. 3, 2025), and to trial against a third DPS officer, see id., Docket Entry 114 at 1-3 (M.D.N.C. Dec. 17, 2024). (See Docket Entry 29 at 10; see also Docket Entry 23-5 at 1-2 (lacking relevant grievance).) Additionally, the CTS table appears to reflect only screened grievances, as the grievances all contain numbers (see Docket Entry 23-5 at 1-2; cf. Docket Entry 2-2 at 43-45, 51, 53 (reflecting that DC-410 forms lack grievance numbers, but that such numbers appear on screening responses)). As such, a material factual dispute exists regarding whether officials rendered the ARP unavailable by failing to screen Plaintiff's grievances. See, e.g., Sutherland II, 2025 WL 963584, at *8 ("find[ing] the grievance procedures were unavailable to [the] plaintiff for the unprocessed complaints regarding second-hand smoke" and thus that material factual dispute existed regarding exhaustion requirement).

Nevertheless, dismissing the Complaint's contentions as "self-serving unsupported allegations" (Docket Entry 23 at 10), "bare assertions" (id. at 11), and "bald assertions" that "do[ not] in any way demonstrate an unavailable grievance process" (id.), Defendants assert that "the credible evidence shows that Plaintiff did not exhaust a grievance concerning excessive force on February 6, 2022 at Scotland C[orrectional Institution] as alleged in the present matter" (id. at 9). This argument warrants no relief. The Complaint contains detailed, sworn allegations regarding Plaintiff's attempts to exhaust his administrative remedies (see,

32

e.g., Docket Entry 2-2 at 1-31), not "bare assertions" (Docket Entry 23 at 11) or "unsupported allegations" (id. at 10). Further, at this stage of the proceedings, Plaintiff, as the nonmoving party, "is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts . . . resolved favorably to him," Miller, 913 F.2d at 1087 (internal quotation marks omitted) (brackets in original); see also Raynor v. Pugh, 817 F.3d 123, 130 (4th Cir. 2016) ("[W]here affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie." (internal quotation marks omitted)).

## CONCLUSION

The Court should consider the merits of Defendants' exhaustion defense, but material factual disputes regarding the availability and exhaustion of administrative remedies preclude summary judgment.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 22) be denied.

This 30th day of January, 2026.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

33